Westlaw.

474 F.3d 770                                                                                                                      Page 1

474 F.3d 770, 39 Employee Benefits Cas. 2342
**(Cite as: 474 F.3d 770)**

H
Briefs and Other Related Documents
Holdeman v. DevineC.A.10 (Utah),2007.
    United States Court of Appeals,Tenth Circuit.
    Terrence D. HOLDEMAN, Plaintiff-Appellant,
v.
Michael W. DEVINE, Defendant-Appellee,
andLeon Flinders; Medical Group Insurance Services; James W. Smith; Mary Carol Johnson; Marian Barnwell; Billie Ann Devine; Gene L. Jones; Larry Herron, Defendants.
American Association of Retired Persons, Amicus Curiae.
No. 05-4302.

Jan. 17, 2007.

**Background:** Representatives of a class of participants in a medical benefit plan governed by the Employee Retirement Income Security Act (ERISA) brought class action against company chief executive officer (CEO), alleging that he breached his fiduciary duties to the plan in various ways. The United States District Court for the District of Utah, Paul Cassell, J., 2005 WL 2893779, entered judgment in favor of CEO, and plan participants appealed.

**Holdings:** The Court of Appeals, Briscoe, Circuit Judge, held that:

(1) at all times when CEO was deciding whether to allocate company funds to the plan or elsewhere, CEO was acting in his capacity as CEO, and not in his capacity as a plan fiduciary, and

(2) case would be remanded where district court failed in the first instance to consider allegations properly raised below such as whether CEO, as plan fiduciary, considered bringing suit against the sponsoring entities to force adequate funding of the plan.

Affirmed in part, reversed in part, and remanded.
West Headnotes
**[1] Labor and Employment 231H** ⇐463

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(C) Fiduciaries and Trustees
            231Hk460 Who Are Fiduciaries
                231Hk463 k. Officers, Directors and Partners. Most Cited Cases
Company's chief executive officer (CEO) did not breach any fiduciary duties to ERISA plan by allegedly failing to allocate adequate funding to the plan and distributing substantial amounts to company principals; at all times when CEO was deciding whether to allocate company funds to the plan or elsewhere, CEO was acting in his capacity as CEO, and not in his capacity as a plan fiduciary. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[2] Federal Courts 170B** ⇐947

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(L) Determination and Disposition of Cause
            170Bk943 Ordering New Trial or Other Proceeding
                170Bk947 k. Further Evidence, Findings or Conclusions. Most Cited Cases
Suit in which ERISA plan participants claimed that company's chief executive officer (CEO) breached his fiduciary duties to the plan would be remanded where district court failed in the first instance to consider allegations properly raised below such as whether CEO, as plan fiduciary, considered bringing suit against the sponsoring entities to force adequate funding of the plan. Employee Retirement Income Security Act of 1974, § 515, 29 U.S.C.A. § 1145.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*771 Brian S. King, (Marcie E. Schaap of King, Burke & Schaap, with him on the briefs), Salt Lake City, Utah, for Plaintiff-Appellant.

Michael W. Homer, (Carl F. Huefner, Jesse C. Trentadue and John D. Luthy with him on the brief) of Suitter Axland, PLLC, Salt Lake City, Utah, for Defendant-Appellee, Michael W. Devine.

Jay E. Sushelsky, (Melvin R. Radowitz), AARP Foundation Litigation, Washington, D.C., filed an amicus curiae brief for the American Association of Retired Persons.

Before KELLY, McKAY, and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

Plaintiffs, the representatives of a class of employees and their dependents who were participants in a medical benefit plan sponsored and funded by their employer and governed by the Employee Retirement Income Security Act of 1974 (ERISA), were left with significant, outstanding medical bills when their employer failed to properly fund the plan and then filed for bankruptcy. Plaintiffs sued defendant Michael Devine, who simultaneously served as an officer of the employer and as a plan fiduciary, alleging he breached his fiduciary duties to the plan in various ways. Following a bench trial, the district court entered judgment in favor of Devine. Plaintiffs now appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, affirm in part, reverse in part, and remand for further proceedings.

*772 I.

*A. Factual background*

*1) The Plaintiffs and the Plan*

Plaintiff Terrence D. Holdeman is the class representative of a group of employees, and dependents of those employees, of the State Line Hotel and Silver Smith Casino in Wendover, Nevada. The hotel and casino were owned and operated by State Line Hotel, Inc., and its related entities (State Line). [FN1]

FN1. These related entities are detailed in the district court's findings of fact. The only relevant fact of note is that all of these entities were closely held, either in corporate form or in partnership, by Anna Smith and her four children: Marian Barnwell, Billie Ann Smith Devine, Mary Carol Johnson, and James W. Smith. App. at 1369-70.

For many years, State Line had maintained a self-funded employee benefit plan. The funding for this plan came from two sources: contributions made by the covered employees and funds allocated to the plan by State Line. Claims for benefits were paid in the order in which they were received. Claims above a certain dollar amount were covered, to the extent they exceeded the relevant dollar amount, by reinsurance.

Holdeman and the other class members were covered under the State Line & Silver Smith Casino Resorts Employee Benefits Plan (the Plan), which became effective on May 1, 1999. The Plan, like State Line's previous plans, was self-funded. The Summary Plan Description (SPD), as originally drafted, "was inconsistent in its identification of who the plan administrator was." App. at 1370.
In particular, the SPD first identified State Line & Silver Smith Casino Resorts as the plan administrator, but later named Michael Devine as the plan administrator and fiduciary of the plan. The third-party administrator for the Plan was identified as MGIS companies. On May 1, 2001, the Plan was amended. The accompanying SPD identified only State Line Hotel, Inc. and Affiliated Entities as the plan administrator and fiduciary. The amended Plan terminated in December of 2001.

*2) Defendant Michael Devine*

Defendant Michael Devine is the son of Billie Ann Smith Devine, one of the owners of State Line. In late 1997 or early 1998, Devine, who at the time was practicing law in Salt Lake City, was asked by professional advisors of State Line to consider helping out the family business. Devine agreed to do so, and began working as State Line's Executive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Vice President and General Counsel in January 1998. Devine later became President of State Line (August 1999), and ultimately President and CEO of State Line (April 2000).

At the time Devine joined State Line in early 1998, State Line was facing financial difficulties resulting from a recent, major expansion project. One of Devine's primary duties thus became working with State Line's lenders to resolve legal issues. For example, Devine was involved in negotiating a forbearance agreement with State Line's lenders in 1998 that allowed State Line to continue to operate and avoid foreclosure. Under the forbearance agreement, State Line had to report monthly to the lenders and was subject to surprise inspections by the lenders' auditors, attorneys, and accountants.

*3) Devine's involvement with the Plan*

When Devine joined State Line in January 1998, he was aware "there were some funding problems with the [P]lan," but "was not integrally involved in dealing with those problems at that time." App. at 1373. "At some point after joining" State Line, however, Devine became involved*773 in making changes to the Plan. *Id.* For example, he and his managerial staff considered changing to a fully-insured group plan, but concluded that option was too expensive for State Line. Devine and his managerial staff then requested competitive proposals for a new third-party administrator for the Plan, and ultimately chose MGIS as the third-party administrator.[FN2] Concomitant with selecting MGIS, Devine and State Line implemented a new, self-funded medical benefits plan on May 1, 1999. It is undisputed that, as of May 1, 1999, Devine was considered a fiduciary of the Plan.

> FN2. Through MGIS, State Line "received access to network discounts with various healthcare providers in the area." App. at 1373. "To be entitled to these discounts, State Line had a number of obligations, including timely payment to medical providers." *Id.* at 1373-74.

When the Plan was first implemented, MGIS "processed all claims and issued all payment checks to providers." *Id.* at 1378. At some point in 2000, "this process changed, and instead of issuing the checks directly to providers, MGIS forwarded the payment checks to State Line for State Line to keep until adequate funding was available, at which point State Line itself would release the checks." *Id.* State Line generally tried to pay the claims on a first-in, first-out basis.

Between May 1, 1999, and April 2000, when he became CEO of State Line, Devine "was vaguely aware of" Plan funding problems and "had been told by one employee ... of a delay in payment." *Id.* at 1375. However, he "did not regularly meet [during this time period] to discuss" these issues. *Id.* Nor did he advise State Line's CEO at that time, Mac Potter, "that the [P]lan had to be funded before any commercial creditors were paid...." *Id.* According to Devine, "he believed that [State Line] had to pay both and that these responsibilities were competing." *Id.*

In late January 2000, State Line's financial personnel determined that the Plan's unpaid medical claims were $300,000 greater than previously believed. When all unpaid medical claims were tallied, they totaled approximately $1.2 million. This determination, in part, led to Devine's appointment as CEO of State Line in April 2000.

After becoming CEO, Devine "began meeting with all of the executive directors," and "[u]nderfunding of the [P]lan became a regular topic of conversation at these meetings, as well as at the meetings of" State Line's Board of Directors, "because the arrearages were [negatively] impact[ing] ... the business and the employees." *Id.* at 1376. Under Devine's direction, State Line "began focusing on growing the 'top line' so that there would be income to pay all expenses-including medical expenses." *Id.* at 1377. As CEO of State Line, Devine generally had no involvement in "deciding the right balance in terms of who would get paid." *Id.* at 1377. Although Devine would "[v]ery occasionally" direct that a particular medical claim be paid in order to prevent the medical provider from cutting off service to State Line employees or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

refusing to give further discounts, id., State Line's general position, under Devine's leadership, was to " pay first whatever was required to keep the doors open and the companies operating and then turn aggressively to the medical claims." Id. at 1378.

During the remainder of 2000, State Line "doubled [its] cash flow which allowed [it] to pay down the arrearages." Id. In particular, between April and October of 2000, State Line "bec[a]me much more aggressive in paying the [unpaid] medical *774 claims," and "managed to 'zero out' " the plan's liabilities to medical providers. Id. at 1376. This " zero balance" status, however, was short-lived. In 2001, State Line experienced a downturn in its business. This, in turn, again led to the underfunding of the Plan and a new backlog of unpaid medical claims which ultimately grew to a total of approximately $1 million by December 2001.

Between May 1999 and December 2001, State Line, at Devine's direction, made a number of distributions to its owners "beyond their salaries in a total amount of approximately $1,245,000.00." Id. at 1379. During most of this time period the Plan was underfunded. The distributions were used by the owners for payment of personal federal income taxes on profits from State Line, and estate tax payments for the estate of Anna Smith (which estate consisted solely of State Line). State Line's lenders allegedly "signed off on the[se] distributions" in an attempt to ensure that the owners, who had personally guaranteed some of State Line's loans, " not get cross-wise with the IRS and have enforcement actions brought against them, which could have threatened the continued viability of" State Line. Id. at 1379-80.

State Line also made charitable contributions during this time period. The majority of these contributions "represented group discounts and packages, for organizations and charities such as the Elks Club." Id. at 1380. These contributions were intended, in part, to promote State Line's business " at a grass roots level...." Id.

In addition to "the backlog of medical claims" that existed during this general time period, State Line was also juggling other bills. Id. These expenses included monthly gaming taxes (which if not paid would lead to the casino's immediate shutdown), payments on slot machine agreements, bills from food vendors, advertising costs, maintenance costs, payroll, and FICA and payroll taxes.

At some point during this period, MGIS, the third-party administrator of the Plan, reported the plan-funding problems to the Department of Labor (DOL). In February 2001, the DOL began an investigation into the matter. During the course of the DOL's investigation, the DOL informed Devine of its concerns that "he had violated ERISA's duty of loyalty, duty of prudence, and duty to refrain from prohibited transactions...." Id. at 1381. Although the DOL ultimately took no formal enforcement action against State Line or Devine, it continued to monitor State Line.

In July 2001, with State Line's revenues continuing to drop, Devine concluded that State Line would be unable to make its interest payments to its lenders. In an attempt to solve this problem, Devine asked the owners "to lend whatever personal monies they could to State Line so that the loan agreements would not be breached." Id. at 1382. "Marian Barnwell could not afford to loan money to State Line, but Billie Ann Devine lent $200,000 by cashing out her personal 401(k) account," "Mary Carol Johnson also cashed out her personal 401(k) account and lent State Line $255,393.63," and "Eve Louis Smith, the wife of partner Jim Smith, lent State Line $460,000 by taking money out of her personal Schwab Investment Account." Id. "These monies were used [by State Line] for principal and interest payments." Id.

State Line's gambling revenues declined further following the September 11, 2001 terrorist attacks. On November 6, 2001, State Line's PPO network " terminated the discount arrangement it had with MGIS." Id. In turn, MGIS sent a letter to Devine on November 8, 2001, "informing him that MGIS was terminating its agreement with *775 State Line." Id. at 1382-83. State Line, after receiving MGIS's letter, terminated the Plan effective December 1, 2001. "As of December 1, 2001," State Line " switched to a fully-funded group plan that offered

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fewer benefits." *Id.* at 1383. On January 10, 2002, State Line, facing foreclosure by its lenders, filed for Chapter 11 bankruptcy protection. In the bankruptcy proceedings, State Line reported that $970,706.44 "was left outstanding in unpaid medical claims." *Id.*

Included among the unpaid medical claims at the time of State Line's bankruptcy filing were:
• Approximately $60,000 in medical expenses incurred by plaintiff Terrence Holdeman. Mr. Holdeman's wife worked for State Line as a pit boss from 1999 to 2001, during which time she and her husband were covered under the plan. Mr. Holdeman incurred the medical expenses with the University of Utah that, despite his "repeated calls to State Line and to the third-party administrator," went unpaid by State Line. *Id.* at 1383.
• Approximately $10,000 to $15,000 in medical expenses incurred by Gerald Anderson, an employee of State Line, and his wife. The Andersons ultimately paid these expenses by charging them to their credit cards.
• Approximately $25,000 in medical expenses incurred by Ruth Ann Wilson, an employee of State Line. Included among these expenses was a $15,000 prepayment Mrs. Wilson and her husband had to make, using money from an inheritance and their savings account, to obtain needed back surgery for Mr. Wilson.

B. *Procedural background*

Plaintiff Holdeman filed this action, on behalf of himself and a purported class comprised of former beneficiaries of the Plan, on May 1, 2002. The complaint named as defendants various officers and directors of State Line, including Devine, and asserted claims under ERISA and the Racketeer Influenced and Corrupt Organizations Act (RICO). The district court dismissed the RICO claims and, on December 15, 2003, certified the ERISA claims as a class action. Holdeman and the class subsequently filed an amended complaint asserting ERISA claims against six State Line officers and directors, including Devine.

After discovery, the parties filed cross-motions for summary judgment. The district court granted summary judgment in favor of all defendants, except for Devine. With respect to Devine, the district court concluded that the "the undisputed evidence indicate[d] that [he] was a fiduciary of the Plan," but that "the following issues remain[ed] for determination: (1) the extent of [his] fiduciary duties to the Plan; and (2) whether he breached his fiduciary duties to the Plan." App. at 798.

The district court conducted a bench trial on September 6-8, 2005. On October 31, 2005, the district court issued written Findings of Fact and Conclusions of Law. Therein, the district court " conclude[d] that ... Devine did not breach his fiduciary duties to the [P]lan or the plan participants under ERISA." *Id.* at 1387. Accordingly, the district court entered judgment in favor of Devine. Plaintiff Holdeman, on behalf of himself and the class, has since filed a notice of appeal.

II.

*Standard of review*

"In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo...." *776Keys Youth Servs., Inc. v. City of Olathe,* 248 F.3d 1267, 1274 (10th Cir.2001).

*Plaintiffs' arguments on appeal*

In their appeal, plaintiffs argue generally that the district court "erred in ruling that Devine ... did not breach [h]is fiduciary duties." Aplt. Br. at 17. More specifically, plaintiffs argue that Devine " breached fiduciary duties owed to the Class in many ways," *id.,* including "1) fail[ing] to ensure that the Plan was fully funded, 2) ... fail[ing] to act with complete loyalty to the Class, 3) ... fail[ing] to act prudently in managing and administering the Plan, and 4) with his fiduciary hat on, ... fail[ing] to act in any way to challenge or question the actions of Devine, acting with his CEO hat, in authorizing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

distributions of over $1.2 million to the owners of the Sponsoring Entities." Aplt. Br. at 26. Plaintiffs also argue that the district court erred in relying on Devine's subjective belief that he was doing the best he could to carry out his dual roles as both CEO and fiduciary, and in ruling that all of Devine's decisions "were business judgments that fall outside the scope of ERISA's fiduciary duty requirements...." *Id.* at 17-18.

*The decision in Luna*

The district court rested its decision almost exclusively on our decision in *In re Luna,* 406 F.3d 1192 (10th Cir.2005). Accordingly, we begin by describing, in some detail, the facts and holding in that case. The plaintiffs therein were the trustees of various employee-benefit funds that, pursuant to the terms of a 1997 collective bargaining agreement (CBA), served the union-represented employees of Luna Steel Erectors, Inc. (Luna Steel), an Oklahoma construction company. Under the terms of the CBA, Luna Steel agreed to submit monthly employer contributions to the funds for the benefit of its employees. In March 1999, Luna Steel's financial condition worsened, and from March until December of 1999, it failed to make the requisite contributions. On December 31, 1999, Luna Steel, at the decision of its directors, ceased operations. Luna Steel's two shareholders, Joyce Luna and her son, Mark Luna, both filed Chapter 7 bankruptcy petitions in August 2000.

In November 2000, the plaintiff trustees filed an adversary proceeding seeking a determination that the Lunas were personally responsible for the unpaid contributions to the funds. The trustees alleged this debt was nondischargeable because the Lunas had committed "fraud or defalcation" while acting in a fiduciary capacity because they " continued to take some income and personal expenses at a time when they should have been making contributions to the [f]unds." *Id.* at 1197-98. In support of this claim, the trustees further argued that the "Lunas were fiduciaries under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), which states, in part, that a fiduciary is one who ' exercises any authority or control respecting management of disposition of [plan] assets.' " *Id.* at 1198 (quoting statute).

The trustees lost in the bankruptcy court and in their appeal to the federal district court. Both of these courts agreed "that while ERISA imposes fiduciary obligations under § 523(a)(4) of the Bankruptcy Code, because unpaid contributions do not constitute 'plan assets,' the Lunas had committed no defalcation and the debt could be discharged in bankruptcy." *Id.* The trustees then appealed to this court.

In addressing the trustees' appeal, we held at the outset that, "[t]o establish ERISA fiduciary status within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), the [t]rustees had to show (1) that the unpaid contributions were plan *777 assets, and (2) that the Lunas exercised authority and control over the management or disposition of these assets." *Id.*

Addressing these issues in order, we first concluded, contrary to the two lower courts, "that the contractual right to collect unpaid contributions is a plan asset" under ERISA. *Id.* In reaching this conclusion, we acknowledged that "[u]nder ordinary notions of property rights, an ERISA plan does not have a *present interest* in the unpaid contributions until they are actually paid to the plan." *Id.* at 1199 (italics in original). Nonetheless, we held "the plan [does] hold[ ] a *future interest* in the collection of the contractually-owed contributions." *Id.* (italics in original). Thus, we concluded, "[t]he plain meaning of the term 'asset' includes a chose in action to collect contractually-owed contributions." *Id.* at 1200. In turn, we held that "the district court erred in concluding that the contributions owed by the Lunas to the [f]unds were not plan assets under ERISA." *Id.*

Turning to the second issue, we began by noting that, under ERISA, an individual "may acquire fiduciary status" either by (a) being expressly appointed by the plan as a fiduciary, or (b) by " exercis[ing] the fiduciary functions set forth in ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)." *Id.* at 1201. These latter functions, we noted, include " a variety of duties commonly performed by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fiduciaries, including the providing of investment advice, administrative control over a plan, advising on whom to retain as legal or investment advisors to a plan, and ultimately, how to invest plan assets." *Id.* In sum, we noted, "[o]nce deemed a fiduciary, either by express designation in the plan documents or the assumption of fiduciary obligations (the functional or de facto method), the fiduciary becomes subject to ERISA's statutory duties." *Id.* " These duties," we stated, " 'relate to the proper management, administration, and investment of fund assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest.' " *Id.* (quoting *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 142-43, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)).

Because the Lunas were not named as fiduciaries in the plan at issue, we proceeded to analyze whether the Lunas "ha[d] assumed functional or de facto fiduciary status...." *Id.* at 1202. In particular, we noted that the critical issue, based upon the facts presented by the parties, was whether the Lunas exercised any authority or control respecting management or disposition of plan assets. *Id.* Addressing this issue, we concluded that "[i]t [wa]s the [t]rustees, not the Lunas, who control[led] the contractual right to collect unpaid contributions from the Lunas." *Id.* More specifically, we concluded that "[w]hether to enforce their contractual rights [wa]s entirely up to the [t]rustees; the Lunas, meanwhile, ha[d] no say over whether this right w[ould] be enforced or not." *Id.*

In concluding that the Lunas had not assumed functional fiduciary status, we also rejected the Ninth Circuit's view that "an employer automatically becomes a fiduciary of an ERISA plan as soon as it breaches its agreement to make employer contributions." *Id.* at 1203 (citing *Northern Cal. Retail Clerks Unions & Food Employers Joint Pension Trust Fund v. Jumbo Markets, Inc.,* 906 F.2d 1371, 1372 (9th Cir.1990)). In our view, "ERISA's text and purpose, the law of trusts, Department of Labor regulatory pronouncements, and case law all lend support to [the] conclusion" that "an employer cannot become an ERISA fiduciary merely because it breaches its contractual obligations to a fund." *Id.* In the Lunas'

case, we concluded, "[t]he act of failing to make *778 contributions to the [f]unds c[ould not] reasonably be construed," under ERISA, "as taking part in the 'management' or 'disposition' of a plan asset." *Id.* at 1204. Rather, we concluded, "[t]he asset in question ... [wa]s the [t]rustees' contractual right to collect the unpaid contributions, and the Lunas exercised no control over how the [t]rustees manage[d] or dispose[d] of that asset." *Id.* In terms of the law of trusts, we continued, "[a] contract to convey property does not give rise to a fiduciary relationship," *id.* at 1204 (citing The Restatement (Third) of Trusts § 5(i) and cmt. i (2001)), and "the relationship of debtor to creditor that results from contract is not fiduciary in nature." *Id.* (citing Restatement § 5(k)). Finally, applying ERISA case law, we concluded "that a delinquent employer contributor is merely a debtor, not a fiduciary." *Id.* at 1205. In the Lunas' case, we noted, they "had no duty other than to make monthly contributions, and no discretion other than to fail to make those required contributions." *Id.* at 1206. "The mere discretion whether to pay debts owed to an employee benefit plan," we held, "does not suffice to confer fiduciary status under ERISA." *Id.*

Finally, and perhaps most importantly for purposes of the instant appeal, we emphasized that "[a]nother essential ingredient in th[e] case [wa]s the fact that the Lunas, as owners of a closely-held corporation, were required to make business decisions with respect to general corporate funds." *Id.* at 1207. Continuing, we stated:

Such business decisions must not be confused with fiduciary actions. It is well-established that an ERISA fiduciary can "wear two hats," meaning an individual can be both an employer and a fiduciary. (citation omitted). Therefore, as the Supreme Court has noted, the "threshold question" in an action for breach of fiduciary duty is whether the alleged fiduciary "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich,* 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000).

Because virtually every business decision an employer makes can have an adverse impact on an employee benefit plan, (citation omitted), courts must "examine the conduct at issue to determine

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether it constitutes management or administration of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary duties." (citation omitted). This is so even where some of the decisions personally benefitted the employer, such as some of the payments made by the Lunas to themselves for personal expenses. (citation omitted). Under the circumstances of this case, the Lunas' decision to use their limited funds to pay other business expenses rather than to make contributions to the [f]unds was a business decision, not a breach of fiduciary duty. (citation omitted). In an attempt to keep the company afloat in the fact of deteriorating finances, the Lunas opted to pay expenses such as employee wages, insurance, and equipment leases. The company's financial condition was so severe, in fact, that Joyce Luna withdrew funds from her IRA to help cover expenses and Mark Luna borrowed money from a local bank for company use. Although the decision to pay expenses rather than make plan contributions had an adverse impact on the [f]unds, we decline to impute fiduciary status to the Lunas based on this fact alone.

*Id.* at 1207-08.

### The district court's application of Luna

The district court, in resolving the instant case, noted that "Devine conceded at *779 trial that he was a fiduciary of the State Line Medical benefits plan at all times relevant to this suit," and thus "the only legal determination left to make [wa]s whether, under the facts as found by the court ..., ... Devine breached any of his fiduciary duties to the plan or the plan participants under ERISA." App. at 1387. Continuing, the district court concluded that "*Luna's* discussion of the analysis to be applied in cases where an individual is both an employer and an ERISA fiduciary [wa]s directly on point with the present case." *Id.* at 1389. Accordingly, the district court stated it would "follow *Luna* and determine whether the actions ... Devine took as an executive and ultimately the CEO of State Line were purely business decisions, not regulated under ERISA, or whether they were decisions taken in his fiduciary capacity under ERISA." *Id.* Doing so, the district court concluded "that all of the actions taken by ... Devine, from the time he joined the companies in 1998, and during the time period relevant to this lawsuit, [we]re properly characterized as business and not fiduciary decisions." *Id.* More specifically, the district court concluded as follows:

• "Failure to fully fund the plan ... was not a result of breach of fiduciary duty to the plan or plan participants, but rather to the pragmatic business decisions ... Devine was forced to make in difficult financial circumstances in order to prevent foreclosure or bankruptcy." *Id.* at 1389.
• "Devine's decisions regarding funding of the plan were ... not 'fiduciary' decisions in any respect, but rather business decisions made to save the companies from bankruptcy-a bankruptcy that would have obviously hurt all the plan participants immediately." *Id.* at 1390.
• "Devine's authorization of distributions to the owners and of charitable contributions during this time period also constituted business, and not fiduciary, decisions." *Id.*

### Plaintiffs' challenges to the conclusions expressly reached by the district court

In their appeal, plaintiffs challenge the conclusions expressly reached by the district court and outlined above. In particular, plaintiffs dispute the district court's conclusion that Devine's decisions regarding how much funding to provide to the plan were purely business decisions that did not implicate his fiduciary duties to the plan. In this regard, plaintiffs argue that "Devine never put on his fiduciary hat to the exclusion of his CEO considerations at any time during the entire 30 months the Plan existed." Aplt. Br. at 32. Plaintiffs further argue that the district court essentially concluded that "what was good for [State Line] was good for the Plan." *Id.* at 30. According to plaintiffs, "the 'business judgment' rule employed by the lower court is the wrong standard." *Id.* Instead, appellants assert, "ERISA's prudent person test at § 1104(a)(1)(B) is the standard against which a fiduciary's actions must be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

measured." *Id.* Finally, plaintiffs argue that Devine violated the laws of Nevada and Utah when he "declared dividends and distributed over $1.2 million to his family members at a time when the Sponsoring Entities were losing millions of dollars each year." *Id.* at 37-38. This, plaintiffs argue, constituted a per se violation of his fiduciary duties towards the plan.

The Supreme Court's decision in *Pegram* (cited by us in *Luna*) speaks directly to these issues. The Court noted therein that, "[u]nder ERISA, ... a fiduciary may have financial interests adverse to beneficiaries." 530 U.S. at 225, 120 S.Ct. 2143. For example, the Court noted, "[e]mployers ... can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as *780 employers (e.g., firing a beneficiary for reasons unrelated to the ERISA plan)...." *Id.* However, the Court emphasized, ERISA requires "that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Id.* As a result, the Court noted, "[i]n every case charging breach of ERISA fiduciary duty, ... the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Id.* at 226, 120 S.Ct. 2143.

[1] Applying these principles to the case at hand, we agree with the limited conclusions reached by the district court, all of which regard Devine's alleged failure to allocate adequate funding to the Plan, including his decision to distribute substantial amounts to the principals of State Line. In particular, at all times when Devine was deciding whether to allocate State Line funds to the Plan or elsewhere, it is clear that he was acting in his capacity as CEO of State Line, and not in his capacity as a plan fiduciary. Indeed, Devine did not have any authority, in his role as plan fiduciary, to make decisions regarding State Line's allocation of its assets and revenue. Rather, only in his role as CEO did Devine have authority to make such decisions. Thus, under the principles outlined in *Pegram*, the district court correctly concluded that Devine was "wearing his CEO hat" in making those allocation-of-funding decisions, and in turn did not breach any fiduciary duties to the Plan in doing so.

*District court's failure to address certain issues*

Plaintiffs also contend that the district court, in its findings of fact and conclusions of law, failed to address certain of their allegations against Devine. Broadly speaking, plaintiffs contend the district court failed to address the fact that Devine "made no independent investigation at all into how he should best manage the Plan and its assets." Aplt. Br. at 29. More specifically, plaintiffs contend that the district court failed to address their allegations that Devine could and should have: (1) resigned as the fiduciary and obtained the appointment of some person or entity who was free from a conflict of interest; (2) resigned as the CEO of State Line; (3) asked the owners to fully fund the Plan; (4) educated the owners about his role as fiduciary and how it possibly conflicted with his role as CEO of State Line; (5) hired separate, outside counsel for the Plan; (6) reported to the Department of Labor State Line's failure to properly fund the Plan; (7) considered, threatened, and/or sued State Line on behalf of the Plan for the unpaid contributions; (8) sold some property owned by State Line to fund the Plan; (9) terminated the Plan; (10) altered or adjusted existing types and levels of medical benefits; and/or (11) informed the beneficiaries that the Plan was not a reliable source of health care benefits and they might need to make alternative arrangements to obtain medical coverage.

The question that must first be answered is whether plaintiffs adequately asserted these allegations below. Plaintiffs' amended complaint broadly alleged violations of Devine's fiduciary duties towards the Plan. For example, the amended complaint alleged that Devine: "failed to act in a manner required by the Plan terms and ERISA to fund the Plan and allow for payment of the Class members' claims"; failed "to discharge [his] duties with respect to the Plan solely in the interest of the participants and beneficiaries"; failed *781 "to provide complete and timely communications to the Plan participants and beneficiaries and their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

representatives regarding funding problems for the Plan and the participants' and beneficiaries' eligibility for benefits"; "failed to promptly pursue sources that would allow for recovery of benefits"; and failed to "communicate[ ] with the Plaintiffs and their representatives completely and truthfully and ha[d] attempted to mislead the Plaintiffs and their representatives and hinder their efforts to obtain information about the status of claims and funding problems for the Plan."

Plaintiffs' allegations became more specific both before and immediately after trial. In their trial brief, plaintiffs argued, in pertinent part, that " Devine was responsible for managing the assets of the Plan," and that these duties "included, among other things, the obligation to aggressively pursue the Sponsoring Entities and demand that they live up to their obligation to fully fund the Plan to the extent necessary to pay the Class claims." App. at 780. Plaintiffs stated that "[t]he evidence w[ould] show that the decision about whether, and how aggressively, the contractual right and obligation that existed between the Plan and the Sponsoring Entities would be enforced was entirely up to Devine," *id.* at 781, and that "Devine's failure to act by not standing up for the rights of the Class members ... [was an] omission[ ] that expose[s] him to liability in this case." *Id.* at 789. In their written "closing argument" brief following trial, plaintiffs argued that Devine violated his fiduciary duties, in pertinent part, by (a) "not hir[ing] separate, outside counsel for the Plan," *id.* at 1332, (b) "not mak[ing] any attempt to have an individual or entity appointed as the named fiduciary and trustee of the Plan who was removed from the conflicts of interest Devine was experiencing," *id.*, (c) "never consider[ing] reporting to the Department of Labor the Sponsoring Entities' failure to fund the Plan," *id.*, (d) "not recogniz[ing], consider[ing] or threaten[ing] to sue the Sponsoring Entities on behalf of the Plan for the unpaid contributions under 29 U.S.C. § 1145," *id.* at 1333, and (e) "not ... tell[ing] the Class members about the funding problems of the Plan when MGIS suggested this was necessary and appropriate." *Id.* at 1334.

In light of these pre- and post-trial allegations and arguments, we conclude that five of the eleven allegations now asserted on appeal by the plaintiffs were properly raised below.[FN3] The remaining six allegations asserted on appeal by plaintiffs were not, however, properly raised below and thus have been waived. *See Cummings v. Norton,* 393 F.3d 1186, 1190 (10th Cir.2005) (noting "the general rule that issues not raised below are waived on appeal"). These include the allegations that Devine should have: (1) resigned as the CEO of State Line; (2) asked the owners of State Line to fully fund the Plan; (3) educated the owners of State Line about his role as fiduciary and how it possibly conflicted with his role as CEO of State Line; (4) sold some property owned by State Line to fund the Plan; (5) terminated the Plan; and (6) altered or adjusted existing types and level of medical benefits.[FN4]

FN3. The district court, in its findings of fact and conclusions of law, stated that it had reviewed "the parties' pre- and post-trial briefs...." App. at 1369.

FN4. Notably, all of these allegations appear to have involved Devine's role as CEO of State Line, and not his role as fiduciary of the Plan. For example, only in his role as CEO could Devine have " resigned as CEO," "asked the owners of State Line to fully fund the Plan," or "sold some property owned by State Line to fund the Plan." Under *Pegram,* none of these actions could have given rise to a claim for breach of fiduciary duty.

*782 Turning to the five allegations that were properly raised by plaintiffs below, it is clear that the district court failed to properly address any of them. To begin with, there is no discussion at all in the district court's order regarding plaintiffs' allegations that Devine should have (1) resigned as the fiduciary and obtained the appointment of a person or entity who was free from a conflict of interest, (2) hired separate, outside counsel for the Plan, or (3) informed the beneficiaries that the Plan was not a reliable source of health care benefits and that they might need to make alternative arrangements to obtain medical coverage.[FN5] Accordingly, we conclude that the case should be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

remanded to the district court for a consideration of those allegations in the first instance. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (noting "the general rule ... that a federal appellate court does not consider an issue not passed upon below.").

> FN5. Devine suggests in his response brief that the district court granted summary judgment in his favor on this third claim. A review of the appendix indicates that the district court dismissed with prejudice the allegation in plaintiffs' amended complaint that Devine "misle[d] or fail [ed] to inform Plaintiffs regarding Funding problems for the Plan." App. at 798. However, as noted, plaintiffs argued in their post-trial brief that Devine failed to inform them of funding problems after MGIS suggested it was necessary for him to do so. Because the district court did not address this argument at all in its findings of fact and conclusions of law, at a minimum it would be helpful on remand if the district court could clarify whether it intended for this allegation to be revived and resolved at trial, or whether, instead, it intended to stand by its pretrial dismissal of the allegation.

As for the remaining two allegations, the district court briefly touched upon them in its findings of fact, but otherwise failed to analyze them in detail in its conclusions of law. With respect to plaintiffs' assertion that Devine should have reported to the Department of Labor State Line's failure to properly fund the Plan, the district court found that (a) MGIS reported plan-funding problems to the DOL, (b) the DOL, based upon MGIS's report, "began an investigation into State Line's underfunding ... in February of 2001," (c) State Line "fully cooperated with [the] DOL's investigation," and (d) the DOL took no formal enforcement action against State Line, but did "continue[ ] to monitor State Line." App. at 1381. The district court did not, however, in its conclusions of law address whether Devine, as a fiduciary of the Plan, violated his fiduciary duties by failing to likewise report the underfunding problems to the DOL. The question on this issue is whether a remand to the district court is necessary. Although a reasonable argument can be made that an independent plan fiduciary (i.e., someone who was not operating under a conflict of interest, like Devine) should have reported the underfunding problems to the DOL, our review of the trial transcript convinces us that such reporting would not have had any noticeable impact, given the fact that the DOL responded to MGIS's report, investigated the underfunding problem, and ultimately took no formal action against State Line. Thus, we conclude that the district court's failure to properly analyze this allegation of breach of fiduciary duty on the part of Devine was harmless.

[2] That leaves only plaintiffs' allegation that Devine should have considered, threatened, and/or sued State Line on behalf of the Plan for unpaid contributions. In its findings of fact, the district court found that "Devine, as fiduciary of the [P]lan, never considered bringing suit against the sponsoring entities to force adequate funding of the [P]lan." App. at 1375. Notwithstanding this factual finding, the district court did not address *783 plaintiffs' allegation in its conclusions of law. Instead, in a one-sentence parenthetical following the above-quoted factual finding, the district court stated: "(If any such suit had been filed, it would have rapidly led to the dissolution of the State Line entities, with the likely effect of immediately terminating the plan.")*. Id.* This cursory statement is, in our view, insufficient to properly address plaintiffs' allegation. To begin with, the district court failed to cite any evidence to support its finding that a lawsuit would have rapidly led to the dissolution of State Line. Moreover, even if that finding is correct, we reject what appears to have been the district court's implication that "what was good for [State Line] was good for the Plan." Aplt. Br. at 30. As the uncontroverted facts of this case make clear, the full payment of the plaintiffs' outstanding medical claims was not necessarily dependent upon the ultimate survival of State Line. Rather, the full payment of the plaintiffs' outstanding medical claims was dependent solely on State Line's proper funding of the Plan. The fact that such full funding of the Plan may have meant that State Line had to default on other outstanding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

474 F.3d 770                                                                                                    Page 12

474 F.3d 770, 39 Employee Benefits Cas. 2342
**(Cite as: 474 F.3d 770)**

debts, or even file for bankruptcy, was not necessarily of consequence to the Plan and its beneficiaries, particularly given State Line's history of underfunding the Plan. Accordingly, we conclude that this issue must likewise be remanded to the district court for further consideration.

The judgment of the district court is AFFIRMED in part and REVERSED in part, and the case is REMANDED to the district court for further proceedings consistent with this opinion.

C.A.10 (Utah),2007.
Holdeman v. Devine
474 F.3d 770, 39 Employee Benefits Cas. 2342

Briefs and Other Related Documents (Back to top)

• 2006 WL 1785951 (Appellate Brief) Plaintiff/Appellant's Reply Brief (Apr. 20, 2006)
• 2006 WL 889662 (Appellate Brief) Plaintiff/Appellant's Brief (Addendum to Brief attached as PDF document to electronic submission) (Appendix to Brief submitted in hard copy only) (Feb. 27, 2006) Original Image of this Document with Appendix (PDF)
• 05-4302 (Docket) (Nov. 25, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.